**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JoAnne McWhorter, | : | Case No. 1:13 CV 1708 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| Defendant. | : | |

## I. INTRODUCTION

Plaintiff JoAnne McWhorter ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (Act), 42 U.S.C. §1381 (Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 15 and 16). For the reasons that follow, the Magistrate recommends the opinion of the Commissioner be reversed and remanded.

## II. PROCEDURAL BACKGROUND

On March 25, 2010, Plaintiff filed an application for SSI under Title XVI of the Act,

1

alleging a period of disability beginning January 30, 2009 (Docket No. 14, p. 157 of 670).

Plaintiff's claim was denied initially on July 20, 2010 (Docket No. 14, p. 91 of 670), and upon

reconsideration on February 11, 2011 (Docket No. 14, p. 101 of 670). Plaintiff thereafter filed a

timely written request for a hearing on September 11, 2011 (Docket No. 14, p. 114 of 670).

On February 7, 2012, Plaintiff appeared with counsel for a hearing before Administrative

Law Judge Valencia Jarvis ("ALJ Jarvis") (Docket No. 14, pp. 29-70 of 670). Also present at

the hearing was an impartial Vocational Expert ("VE") (Docket No. 14, pp. 63-69 of 670). ALJ

Jarvis found Plaintiff to have a severe combination of lumbago, lumbar strain and sprain, mild

degenerative changes of the left hip, obesity, and depressive disorder not otherwise specified

("NOS"), with an onset date of February 19, 2010 (Docket No. 14, p. 17 of 670).

Despite these limitations, ALJ Jarvis determined, based on all the evidence presented,

that Plaintiff had not been disabled within the meaning of the Social Security Act at any time

from the application date through the date of her decision (Docket No. 14, p. 22 of 670). ALJ

Jarvis found Plaintiff had the residual functional capacity to perform light work, as defined in 20

C.F.R. § 416.967(b), but was limited to only occasional stooping (Docket No. 14, p. 18 of 670).

The ALJ also determined that Plaintiff had the ability to understand, remember, and carry out

simple instructions and perform repetitive tasks but required an environment with few or no fast-

paced production requirements (Docket No. 14, p. 19 of 670). While Plaintiff had no past

relevant work, ALJ Jarvis found her capable of performing other work in the national economy

(Docket No. 14, p. 21 of 670). Plaintiff's request for benefits was therefore denied (Docket No.

14, p. 22 of 670).

On August 7, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern

Division, seeking judicial review of her denial of SSI (Docket No. 1).  In her pleading, Plaintiff

alleged multiple errors, including:  (1) improper use of Acquiescence Ruling 98-4(6); (2) failure

to evaluate Listing 12.04; (3) inaccurate assessment of physical residual functional capacity; and

(4) a violation of the treating physician rule (Docket No. 15).  Defendant filed its Answer on

November 7, 2013 (Docket No. 13).

### III.  FACTUAL BACKGROUND

#### A.  THE ADMINISTRATIVE HEARING

An administrative hearing was convened on February 7, 2012 (Docket No. 14, pp. 29-70

of 670).  Plaintiff, represented by counsel Sara Dean Cora, appeared and testified from

Cleveland, Ohio (Docket No. 14, pp. 36-63 of 670).  Also present and testifying was VE Bruce

Growick ("VE Growick") (Docket No. 14, pp. 63-69 of 670).  ALJ Jarvis presided over the

hearing from St. Louis, Missouri (Docket No. 14, p. 15 of 670).

#### 1.  PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was fifty-one years old and resided with her two

youngest children, ages sixteen and seventeen (Docket No. 14, pp. 36, 46 of 670).  She testified

that she was in special education classes and completed the ninth grade (Docket No. 14, p. 36 of

670).[1]  Plaintiff indicated that she attempted to earn her general equivalency degree (GED) but

could not adequately focus or concentrate (Docket No. 14, p. 36 of 670).  Pre-testing evaluations

for the GED allegedly placed Plaintiff at a third grade level for math and reading (Docket No.

_____

[1]
        There seems to be some discrepancy as to what grade Plaintiff actually completed.  As noted by
ALJ Jarvis, Plaintiff's application indicated that she completed the eleventh grade (Docket No. 14, p. 45
of 670), while Plaintiff testified that she completed the ninth grade (Docket No. 14, p. 36 of 670).
Plaintiff offered no explanation as to the discrepancy (Docket No. 14, p. 45 of 670).

14, p. 37 of 670).  Plaintiff indicated that she received financial support and food stamps in the amount of nine hundred seventy-six dollars per month (Docket No. 14, pp. 47-48 of 670).

Plaintiff gave testimony concerning a number of her alleged impairments, beginning with her mental health issues. According to Plaintiff, she suffers from extreme depression, cannot concentrate, and gets very irritable (Docket No. 14, pp. 37-38 of 670). She spends most of her day in her bedroom and finds it difficult to be around a crowd of people (Docket No. 14, pp. 39, 43 of 670). When asked, Plaintiff could not identify anything in particular that caused her depression, stating that the depression "just comes. It's just there" (Docket No. 14, p. 49 of 670). Plaintiff also indicated that she hears voices and sees shadows on a daily basis (Docket No. 14, pp. 39-40 of 670).  She described these hallucinations as "voices, shadows, people, things, [and] images" that will follow her, calling out her name (Docket No. 14, p. 51 of 670).  The voices also mumble incoherently at times (Docket No. 14, p. 51 of 670).

Plaintiff testified that she relies heavily upon the assistance of her adult daughter, who takes Plaintiff to her appointments, manages her household, pays her bills, cooks, cleans, does the laundry, and reminds Plaintiff to maintain her personal hygiene (Docket No. 14, pp. 37-39, 43 of 670).  Plaintiff indicated that her two teenagers also help with the housework (Docket No. 14, p. 40 of 670).  During her testimony, Plaintiff indicated that she found it difficult to be around a crowd of people (Docket No. 14, p. 43 of 670), but later admitted that she often went to church (Docket No. 14, p. 61 of 670).

With regard to her physical impairments, Plaintiff described both lower back and hip pain.  Plaintiff testified that she suffers from constant pain in her lower back that severely impacts her ability to walk, lift, and carry (Docket No. 14, p. 41 of 670).  Although she does not

4

use any type of assistive device, Plaintiff stated that she leans on others, namely her son, and uses him as sort of a crutch to move around (Docket No. 14, p. 42 of 670).  Plaintiff testified that she could walk from her living room to her porch before needing to sit down (Docket No. 14, p. 42 of 670).  She can lift a gallon of milk, but stated that doing so is a struggle (Docket No. 14, p. 42 of 670).  When asked to rate her lower back pain on a scale of one to ten, Plaintiff testified that the pain was an eight or nine without her medication, but decreased to a two or three with medication (Docket No. 14, p. 57 of 670).  Plaintiff indicated that her hip pain was less severe, usually a six or seven without medication and a one or two with medication (Docket No. 14, p. 57 of 670).  Plaintiff also testified that her hip pain was sporadic (Docket No. 14, p. 41 of 670).

## 2.  VOCATIONAL EXPERT TESTIMONY

Since Plaintiff had no past relevant work, ALJ Jarvis went right into her hypothetical questions:

> I'd like for [] to assume an individual of Ms. McWhorter's age – she is currently 51 – education – the record says 11, she said 9th today, a 9th grade education – no past relevant work experience, and that this person has the ability to lift and carry 20 pounds occasionally, 10 pounds frequently; may stand and walk 6 out of an 8-hour day and sit for 6 out of an 8-hour day.  Stooping for this individual would be limited to occasional.
>
> Also, this individual has the ability to understand, remember, carry out simple instructions and perform repetitive tasks.  Is there any work in the regional or national economy that such an individual [inaudible]?

(Docket No. 14, p. 64 of 670).  Taking into account these limitations, the VE testified that such an individual would be able to perform a variety of jobs in the national economy, including:  (1) basic factory-based production work (assembly jobs) of a light, unskilled nature listed under

5

DOT[2] 706.684-034, for which there are 921,600 positions nationally, 57,600 in the State and 3,600 in the Cuyahoga County; (2) machine tender, listed under DOT 754.685-014, for which there are 1,075,200 positions nationally, 67,200 in the State and 4,200 in the Cuyahoga County; and (3) quality assurance and inspection jobs (factory-based work), listed under DOT 726.685-303, for which there are 614,400 positions nationally, 38,400 in the State and 2,400 in the Cleveland metropolitan area (Docket No. 14, p. 65 of 670).

For her second hypothetical, ALJ Jarvis built on the first, adding "few if any workplace changes, free of fast-paced production requirements" (Docket No. 14, p. 66 of 670).  The VE indicated that the same jobs would be available, but in reduced quantities.  Specifically, the number of positions available would be reduced by approximately forty percent with these additional limitations (Docket No. 14, p. 66 of 670).  VE Growick also testified, when asked, that employers will typically tolerate a day and a half per month of unexcused, unscheduled absences and an employee being off-task twelve percent of the day (Docket No. 14, pp. 66-67 of 670).

During cross-examination, Plaintiff's counsel posed the following question to the VE:

If we take the judge's first hypothetical, with the additional limitations that this person's ability to maintain attention and concentration for extended periods is markedly limited, that this person's ability to perform activities within a schedule and maintain regular attendance and be punctual within customary tolerances is also markedly limited, and this person's ability to complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods is markedly limited, if the person's ability to accept instructions and respond appropriately to criticism from supervisors is markedly limited, that this person's

---

[2]

  DICTIONARY OF OCCUPATIONAL TITLES is a publication that provides the best snapshot of how jobs continue to be performed across the county.

> ability to respond appropriately to changes in the work setting is markedly limited,
> and this person's ability to travel in unfamiliar places or use public transportation is
> markedly limited, would those jobs that you cited still be available?

(Docket No. 14, p. 68 of 670)[3].  The VE testified that, with those limitations, an employee would

require an accommodated position (Docket No. 14, p. 68 of 670).

In a second hypothetical, counsel questioned whether, if an employee had difficulty

maintaining attention and concentration for more than thirteen percent of the workday, such a

limitation would preclude competitive work (Docket No. 14, p. 68 of 670).  The VE answered in

the affirmative (Docket No. 14, p. 69 of 670).

## B.     MEDICAL RECORDS

### 1.     PHYSICAL HEALTH ISSUES

Plaintiff's physical health issues date back to November 2008 when Plaintiff was seen for

complaints of chronic and mechanical lower back pain (Docket No. 14, p. 299 of 670). Plaintiff

reported that her pain was aggravated by standing and/or walking for more than a couple of

minutes and she rated the pain as a nine out of a possible ten (Docket No. 14, p. 299 of 670).

She had severely decreased range of motion with increased pain at the end range of her forward

flexion but was negative for radicular symptoms (Docket No. 14, p. 300 of 670).  Plaintiff was

diagnosed with degeneration of her lumbar or lumbosacral intervertebral disc, lower back pain,

and lumbar facet arthropathy (Docket No. 14, p. 302 of 670).  MetroHealth System staff

attempted to prescribe Plaintiff morphine and physical therapy, but she requested only Vicodin

and refused therapy (Docket No. 14, p. 299 of 670).

Plaintiff was not seen for back pain again until March 21, 2010, when she saw Dr.

---

[3]

ALJ Jarvis noted that the phrase "markedly limited" is not vocationally relevant within Social
Security regulations (Docket No. 14, p. 68 of 670).

Howard Smith, M.D. ("Dr. Smith") complaining of long-term back pain (Docket No. 14, p. 405 of 670). She had diffuse tenderness of her lumbosacral spine and paraspinous muscles areas, but otherwise had a normal evaluation (Docket No. 14, p. 406 of 670). An MRI revealed no evidence of a focal protrusion or extrusion, but did show degenerative disc and facet disease in her lumbar spine (Docket No. 14, p. 408 of 670). Dr. Smith diagnosed Plaintiff with lumbago, lumbar sprain and strain, and noted that she was overweight (Docket No. 14, pp. 406-07 of 670).

Plaintiff returned to Dr. Smith on May 6, 2010, still complaining of back pain, which she rated as a seven to ten out of a possible ten (Docket No. 14, p. 401 of 670). She had diffuse tenderness of her lumbosacral spine and paraspinous muscle areas with an antalgic gait (Docket No. 14, p. 402 of 670). Her diagnosis remained unchanged (Docket No. 14, pp. 402-03 of 670).

On May 10, 2010, Plaintiff visited the emergency room after a car accident complaining of pain in her left shoulder and neck (Docket No. 14, p. 315 of 670). She had a full range of motion in all her extremities with no tenderness (Docket No. 14, p. 316 of 670). She was diagnosed with a cervical strain (Docket No. 14, p. 316 of 670).

Two days later, on May 12, 2010, Plaintiff presented with bilateral wrist and arm pain after allegedly being confronted and handcuffed by police officers who forcibly grabbed her arms (Docket No. 14, p. 309 of 670). Plaintiff rated her pain as a ten out of a possible ten, described the pain as "aching and burning and sharp and numb," and claimed that her left arm was swollen and "darker than the night" (Docket No. 14, p. 309 of 670).

On June 21, 2010, Plaintiff underwent a radiological exam of her pelvis and left hip (Docket No. 14, p. 356 of 670). The scan showed mild degenerative changes in her hips but no acute bony process (Docket No. 14, p. 356 of 670). On that same date, Plaintiff had radiology

8

scans of her hands and bilateral forearms (Docket No. 14, pp. 357, 359 of 670).  The scans were mostly normal, showing only some mild degenerative changes (Docket No. 14, pp. 357, 359 of 670).  Plaintiff returned to Dr. Smith on June 29, 2010, still complaining of lower back and now left hip pain (Docket No. 14, p. 396 of 670).  She rated her pain as a five through ten out of a possible ten (Docket No. 14, p. 396 of 670).  Plaintiff had diffuse tenderness in her lumbosacral spine and paraspinous muscle areas with an antalgic gait (Docket No. 14, p. 396 of 670).  Her diagnosis remained unchanged (Docket No. 14, pp. 397-98 of 670).  Plaintiff had a similar examination with Dr. Smith on July 11, 2010 (Docket No. 14, pp. 535-36 of 670).  Again, her diagnosis remained unchanged (Docket No. 14, p. 536 of 670).

Plaintiff returned to Dr. Smith on August 30, 2010, with continued complaints of lower back and left hip pain (Docket No. 14, p. 389 of 670).  She had diffuse tenderness in her lumbosacral spine and paraspinous muscle areas with an antalgic gait (Docket No. 14, p. 390 of 670).  Inspection and palpation of Plaintiff's joints, bones, muscles, tendons of the four extremities showed them to be within normal limits with no swelling, erythema, effusions or tenderness (Docket No. 14, p. 390 of 670).  Again, Dr. Smith diagnosed Plaintiff with lumbago and chronic lower back pain (Docket No. 14, p. 391 of 670).  During this appointment, however, Dr. Smith also made note of Plaintiff's possible opioid dependence due to her continuous use of Vicodin.  Plaintiff was given a prescription for Vicodin and physical therapy (Docket No. 14, p. 391 of 670).

During an appointment with Dr. Smith in September 2010, Plaintiff rated her pain as between a five and ten out of possible ten and claimed to be going to physical therapy (Docket No. 14, p. 629 of 670).  Dr. Smith diagnosed her with lumbago, opioid dependence, lumbar

9

strain/sprain, depression, enthesopathy of the hip, "sacro-iliac" pain, and being overweight (Docket No. 14, pp. 630-31 of 670). Plaintiff returned to Dr. Smith in December 2010, February 2011, and March 2011 (Docket No. 14, pp. 516-19, 523-34, 642-44 of 670). By February 2011, Plaintiff was reporting that she was no longer attending physical therapy (Docket No. 14, p. 516 of 670). In March 2011, Plaintiff rated her pain between a four and an eight out of a possible ten (Docket No. 14, p. 642 of 670). Her diagnosis remained unchanged (Docket No. 14, pp. 643-44 of 670). Plaintiff did not return to Dr. Smith until September 26, 2011, still complaining of lower back and now bilateral hip pain (Docket No. 14, p. 648 of 670). She rated her pain as an eight out of a possible ten (Docket No. 14, p. 648 of 670). She had diffuse tenderness of her lumbosacral spine and paraspinous muscle areas with an antalgic gait (Docket No. 14, pp. 648-49 of 670). Dr. Smith diagnosed Plaintiff with lumbago, sprain of the lumbar region, chronic pain, depression, opioid dependence, essential hypertension, and being overweight (Docket No. 14, pp. 649-50 of 670). She was given a hydrocortisone injection (Docket No. 14, p. 649 of 670).

### 2. MENTAL HEALTH ISSUES

### a. DR. OLUFUNKE O. FAJOBI, M.D.

Plaintiff's history with mental health issues and treatment dates back to September 9, 2008, when she first saw psychiatrist Dr. Olufunke O. Fajobi ("Dr. Fajobi") (Docket No. 14, p. 415 of 670). While Dr. Fajobi found Plaintiff to be a poor historian, he noted that Plaintiff reported depressed mood, crying spells, feelings of guilt, thoughts of death, auditory hallucinations, racing thoughts, and loss of interest, energy, and motivation (Docket No. 14, p. 415 of 670). Plaintiff denied any substance abuse history (Docket No. 14, p. 416 of 670). .Her

behavior was guarded and her judgment and insight were questionable (Docket No. 14, p. 416 of 670).  Dr. Fajobi diagnosed Plaintiff with depression NOS with a Global Assessment of Functioning ("GAF")[4] score range of fifty-one to sixty (Docket No. 14, p. 417 of 670).  He also noted a history of cocaine dependence (Docket No. 14, p. 417 of 670).  Plaintiff was prescribed Cymbalta and Abilify (Docket No. 14, p. 417 of 670).

Plaintiff returned to Dr. Fajobi numerous times over the next three years, primarily for medication management.  Although her diagnosis remained unchanged during this time (Docket No. 14, pp. 240, 246, 253, 261, 264, 290, 295, 422, 457, 469, 475, 482, 555, 561, 568 of 670), her symptoms, presentation, and medication varied.  In November 2008, Plaintiff reported that her auditory hallucinations had faded (Docket No. 14, p. 294 of 670).  She was prescribed Ativan in addition to her current medications (Docket No. 14, p. 293 of 670).  During an appointment on February 27, 2009, Dr. Fajobi noted that Plaintiff had been out of Cymbalta for three weeks and documented poor medication compliance (Docket No. 14, p. 289 of 670). The situation was similar in October 2009 when Plaintiff reported that she had been out of medication for one month (Docket No. 14, p. 463 of 670).  She reported being more depressed, "seeing stuff," and hearing mumbling (Docket No. 14, p. 263 of 670).  Dr. Fajobi noted her medication non-compliance as well as therapy non-compliance (Docket No. 14, p. 263 of 670).  On December 8, 2009, Plaintiff reported feeling more relaxed and an improvement in her depressive symptoms (Docket No. 14, p. 261 of 670).  She complained of anxiety issues, but also noted that she was allegedly having "racial issues" with the police officer that lived across the street (Docket No.

---

[4] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of fifty-one to sixty indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (HEREINAFTER DSM-IV) 34 (AM. PSYCHIATRIC ASSN.) 4th ed. 1994).

14, p. 261 of 670).  By January 2010, Plaintiff's anxiety had become constant (Docket No. 14, p.

252 of 670).  She continued to report auditory hallucinations (Docket No. 14, p. 252 of 670).

She also reported thoughts of death but expressed no suicidal intent (Docket No. 14, p. 252 of

670).

During an appointment on March 18, 2010, Dr. Fajobi noted that all of Plaintiff's

assessments were normal, but reported that her affect seemed "somewhat odd" (Docket No. 14,

pp. 239-40 of 670).  Plaintiff was prescribed Trazodone (Docket No. 14, p. 239 of 670). By July

2010, Plaintiff was reporting an improvement in her mood but also noted that she had again been

off of her medications for approximately one week (Docket No. 14, p. 456 of 670).  In

September 2010, Plaintiff reported still being depressed, seeing "stuff," and hearing "things"

(Docket No. 14, p. 481 of 670).  She still had thoughts of suicide but would think of her children

(Docket No. 14, p. 481 of 670).  Dr. Fajobi noted that Plaintiff's mood was depressed and her

affect was somewhat cold (Docket No. 14, p. 481 of 670).  By December 2010, Plaintiff reported

that she was less depressed, worrying less, and had fewer auditory hallucinations (Docket No.

14, p. 468 of 670).

In March 2011, Dr. Fajobi noted that Plaintiff still had depressive symptoms, but they

occurred secondary to stressors (Docket No. 14, p. 474 of 670).  On May 11, 2011, Dr. Fajobi

added Wellbutrin to Plaintiff's medications, noting that Plaintiff still claimed to be depressed

although she had difficulty establishing her symptoms (Docket No. 14, p. 567 of 670).  On May

25, 2011, Plaintiff reported seeing intermittent shadows (Docket No. 14, p. 560 of 670).  On May

31, 2011, reported that "I am still depressed" and Dr. Fajobi prescribed a trial of Valium (Docket

No. 14, p. 561 of 670).  Plaintiff's last documented appointment with Dr. Fajobi occurred on July

5, 2011 (Docket No. 14, p. 554 of 670). She complained of low mood, anxiety, and seeing shadows (Docket No. 14, p. 554 of 670). Her medication regimen remained unchanged (Docket No. 14, p. 554 of 670).

      b.    CHRISTINE M. WARNER, LISW.

Simultaneous to her treatment and medication management with Dr. Fajobi, Plaintiff was also seeing licensed social worker Christine M. Warner ("Ms. Warner") for therapy. Plaintiff's session with Ms. Warner started in November 2008 (Docket No. 14, p. 296 of 670). Plaintiff reported hearing voices and having mood swings, crying spells, and difficulty concentrating and focusing (Docket No. 14, p. 296 of 670). Ms. Warner diagnosed Plaintiff with severe major depression with psychotic features (Docket No. 14, p. 298 of 670). Plaintiff returned to Ms. Warner in late December 2008 (Docket No. 14, p. 291 of 670). She rated her mood as a four out of a possible ten and claimed that her mood and auditory hallucinations had improved (Docket No. 14, p. 291 of 670). Her diagnosis remained unchanged (Docket No. 14, p. 293 of 670).

Plaintiff's treatment records with Ms. Warner then jump to January 9, 2010, when she came in alleging that there was a police officer who lived across the street who was harassing her (Docket No. 14, p. 258 of 670). Ms. Warner noted that Plaintiff was very focused on this situation and suspected that Plaintiff would only seek treatment when she was in crisis (Docket No. 14, p. 258 of 670). Plaintiff was cooperative but agitated and anxious (Docket No. 14, p. 259 of 670). During an appointment on January 31, 2010, Plaintiff reported still being shaken due to the alleged incidents with the police officer and had shaved her head allegedly because her hair was falling out due to her nerves (Docket No. 14, p. 250 of 670). She described episodes of post-traumatic stress disorder ("PTSD") accompanied by flashbacks and nightmares

13

(Docket No. 14, p. 250 of 670).  Plaintiff's issues with the police officer continued to be a constant during her therapy sessions (Docket No. 14, p. 248 of 670).

On February 28, 2010, Plaintiff told Ms. Warner that she often had difficulty "coming down," and rated her mood as a four out of a possible ten (Docket No. 14, p. 243 of 670).  Ms. Warner noted that Plaintiff was cooperative, but impulsive, withdrawn, and anxious (Docket No. 14, p. 244 of 670).  Her diagnosis remained unchanged (Docket No. 14, p. 245 of 670).

Plaintiff returned to Ms. Warner on March 14, 2010, claiming that she was not doing well (Docket No. 14, p. 241 of 670).  She reported flight of ideas and confusion, especially with regard to the police officer (Docket No. 14, p. 241 of 670).  She also expressed a general fear and inability to focus on her daily activities and tasks (Docket No. 14, p. 241 of 670).  Ms. Warner noted that Plaintiff had "loosened associations", racing thoughts, flight of ideas, and was vague (Docket No. 14, p. 242 of 670).

Two weeks later, on March 27, 2010, Plaintiff reported to her appointment in tears, claiming she just wanted to give up because everything was a fight (Docket No. 14, p. 237 of 670).  She rated her mood as a five out of a possible ten and was cooperative but restless and impulsive (Docket No. 14, p. 237 of 670).  Ms. Warner found Plaintiff's thought process to be logical and organized and her judgment and insight were fair (Docket No. 14, pp. 237-38 of 670). Plaintiff had a similar appointment with Ms. Warner on April 10, 2010 (Docket No. 14, pp. 235-36 of 670).  Her thought process was logical, organized and her mood was anxious, dysphoric.  Plaintiff was encouraged to continue therapy and medication management with Dr. Fajobi (Docket No. 14, p. 235 of 670).

During an appointment on July 5, 2010, Plaintiff told Ms. Warner that she had been

14

arrested and taken to jail but the officers refused to tell her the charges (Docket No. 14, p. 487 of 670).  Although the charges were dismissed the next day, Plaintiff was convinced that the police department was out to get her (Docket No. 14, p. 487 of 670).  Her diagnosis remained unchanged (Docket No. 14, p. 488 of 670).

On October 20, 2011, Plaintiff continued to have auditory and visual hallucinations.  She was given new medications and encouraged to utilize a medicine container (Docket No. 14, p. 665 of 670).

### 4.    EVALUATIONS.

#### a.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.

On July 8, 2010, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Marianne Collins, Ph. D. ("Dr. Collins") (Docket No. 14, pp. 363-66 of 670).  Rather than completing her own unique evaluation, Dr. Collins adopted Plaintiff's Mental Residual Functional Capacity Assessment given on February 4, 2009 (Docket No. 14, p. 365 of 670).

#### b.    PSYCHIATRIC REVIEW TECHNIQUE

On that same day, Dr. Collins administered a Psychiatric Review Technique, a form that the Social Security Administration uses to make its determination about whether the claimant qualifies for disability based on mental condition (Docket No. 14, pp. 367-80 of 670).  She concluded that Plaintiff suffered from a major depressive disorder and borderline intellectual functioning (Docket No. 14, pp. 370-71 of 670).  With regard to Paragraph B criteria of the Listings[5], Dr. Collins found Plaintiff had moderate restrictions with regard to her activities of

---

[5]    Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity."  20 C.F.R. § 494, Subpart P, Appendix 1, § 12.00(A).

daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace with no episodes of decompensation (Docket No. 14, p. 377 of 670).   Dr. Collins found no evidence of Paragraph C[6] criteria (Docket No. 14, p. 378 of 670).

        c.     **PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.**

On July 10, 2010, Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner Dr. William Bolz, M.D. ("Dr. Bolz") (Docket No. 14, pp. 381-88 of 670).  Dr. Bolz determined that Plaintiff could:  (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for a total of six hours during an eight-hour workday; (4) sit for a total of six hours during an eight-hour workday (Docket No. 14, p. 382 of 670); and (5) occasionally stoop (Docket No. 14, p. 383 of 670).  As was the case with Dr. Collins' Mental Residual Functional Capacity Assessment, Dr. Bolz also adopted the Physical Residual Functional Capacity Assessment administered on February 4, 2009 (Docket No. 14, p. 382 of 670).

        d.     **MEDICAL FUNCTIONAL CAPACITY ASSESSMENT**

Plaintiff's records also indicate that her treating psychiatrist, Dr. Fajobi, completed a Medical Functional Capacity Assessment on her behalf (Docket No. 14, p. 553 of 670).  Dr. Fajobi opined that Plaintiff was moderately limited with regard to her ability to:  1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being

---

[6] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

distracted by them; (6) make simple work-related decision; (7) interact appropriately with the general public; (8) ask simple questions or request assistance; (9) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (11) respond appropriately to changes in the work setting; (12) be aware of normal hazards and take appropriate precautions; (13) travel in unfamiliar places or use public transportation; and (14) set realistic goals or make plans independently of others (Docket No. 14, p. 553 of 670). Dr. Fajobi concluded that Plaintiff was markedly limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (5) accept instructions and respond appropriately to criticism from supervisors (Docket No. 14, p. 553 of 670).  Dr. Fajobi determined that Plaintiff was unemployable (Docket No. 14, p. 553 of 670).

       **e.**    **PSYCHOLOGICAL QUESTIONNAIRE**

On December 19, 2011, Ms. Warner completed a Psychological Questionnaire on behalf of Plaintiff, setting forth Plaintiff's diagnosis as depressive disorder not elsewhere classified and stated that her symptoms included audio and visual hallucinations, memory loss, isolation and anxiety (Docket No. 14, p. 657 of 670).  Ms. Warner noted that Plaintiff was unable to maintain concentration and focus, had difficulty relating to others given her paranoid ideation, and was distractible and easily agitated (Docket No. 14, pp. 657-58 of 670).  Ms. Warner opined that Plaintiff suffered from these symptoms on a daily basis (Docket No. 14, p. 658 of 670).

17

#### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional

capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citin*g *Heston v. Comm'r of Soc. Sec*., 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).  A dispositive finding by the Commissioner at any point in the five-step process terminates the review.  *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Jarvis made the following findings:

1.    Plaintiff has not engaged in substantial gainful activity since February 19, 2010, the application date.

2.    Plaintiff has the following severe impairments:  lumbago, lumbar strain and sprain, mild degenerative changes of the left hip, obesity, and depressive disorder NOS.

19

3.     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.     Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except she is limited to occasional stooping.  She has the ability to understand, remember, and carry out simple instructions and perform repetitive tasks.  She requires few, if any, workplace changes free of fast-paced production requirements.

5.     Plaintiff has no past relevant work.

6.     Plaintiff was forty-nine years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7.     Plaintiff has a limited education and is able to communicate in English.

8.     Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

9.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10.    Plaintiff has not been under a disability, as defined in the Social Security Act, since February 19, 2010, the date the application was filed.

(Docket No. 14, pp. 15-23 of 670).  ALJ Jarvis denied Plaintiff's request for SSI benefits

(Docket No. 14, p. 22 of 670).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to

42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d

830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the

Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard

or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v.*

*Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any

20

fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833

(*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of

Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the

Commissioner are not subject to reversal merely because there exists in the record substantial

evidence to support a different conclusion . . . This is so because there is a 'zone of choice'

within which the Commissioner can act, without the fear of court interference." *McClanahan*,

474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ erred:  (1) by adopting the prior

ruling of an ALJ using Acquiescence Ruling 98-4(b) with regard to Plaintiff's mental

impairments; (2) by failing to find Plaintiff's impairments met and/or equaled Listing 12.04; (3)

in her assessment of Plaintiff's residual functional capacity; and (4) by failing to abide by the

treating physician rule with regard to Plaintiff's treating psychiatrist (Docket No. 15).

### B.  DEFENDANT'S RESPONSE

Defendant disagrees and argues:  (1) the ALJ reasonably applied Acquiescence Ruling

98-4(6); (2) Plaintiff did not meet or medically equal Listing 12.04; (3) based on the evidence,

Plaintiff is capable of performing light work; and (4) the ALJ reasonably assigned the opinion of

Plaintiff's treating psychiatrist little weight (Docket No. 16).

### C.  DISCUSSION

1.     ACQUIESCENCE RULING 98-4(6)

In her first assignment of error, Plaintiff argues that the ALJ erred by simply adopting the

opinion of a former ALJ with regard to Plaintiff's mental and physical impairments (Docket No.

15, pp. 14-15 of 20).  According to Plaintiff, the new psychiatric and therapy records in her

current application, as well as the mild degenerative changes in her left hip are "new and

material" changes that require an updated residual functional capacity assessment (Docket No.

15, p. 15 of 20).  Defendant disagrees, arguing that ALJ Jarvis found Plaintiff's physical

complaints exceeded what the medical evidence showed and her mental impairments had not

increased in severity since the previous mental residual functional capacity assessment (Docket

No. 16, pp. 13-14 of 21).  Furthermore, although ALJ Jarvis added additional limitations to

Plaintiff's residual functional capacity, these limitations actually restricted, rather than expanded,

Plaintiff's residual functional capacity, thereby making any alleged error harmless (Docket No.

16, p. 14 of 21).  Defendant is correct.

When a claimant files a subsequent disability claim after he or she has already received a

final decision concerning an entitlement to benefits, "the Commissioner is bound by this

determination absent changed circumstances."  *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d

837, 842 (6th Cir. 1997).  Social Security Acquiescence Ruling 98-4(6) reflects this holding:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the prior
> claim in determining whether the claimant is disabled with respect to the
> unadjudicated period *unless there is new and material evidence relating to such a
> finding or there has been a change in the law, regulations or rulings affecting the
> finding or the method for arriving at the finding*.

1998 SSR LEXIS 5, *9 (June 1, 1998) (emphasis added). New evidence is defined as evidence "not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). "In order for the claimant to satisfy [the] burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

Here, Plaintiff received a prior unfavorable ruling from the Commissioner on February 4, 2009 (Docket No. 14, pp. 77-86 of 670). Prior to this decision, Plaintiff had received benefits from November 1, 1996 through December 1, 2005, for borderline intellect, depressive disorder, and pain disorder (Docket No. 14, p. 79 of 670). Here, since neither party argues that there has been a change in law since the prior unfavorable decision, Plaintiff must now show that there exists "new and material" evidence to warrant a new residual functional capacity assessment. *See* SSR LEXIS 1998 5 at *9. Plaintiff is unable to meet this burden.

With regard to her mental health impairments, Plaintiff previously received benefits for depressive disorder (Docket No. 14, p. 79 of 670). Her current diagnosis and severe impairment finding by ALJ Jarvis is similar: depressive disorder NOS (Docket No. 14, p. 17 of 670). While Plaintiff's paranoia concerning police harassment certainly seems to be new as of January 2010 (Docket No. 14, p. 258 of 670), Plaintiff fails to show how this alleged paranoia would have caused the previous ALJ to reach a different disposition with regard to terminating her disability benefits. Furthermore, Plaintiff seemed to improve on medication, when she remembered to take it. After being prescribed a regimen of Cymbalta and Abilify, Plaintiff reported that her

23

depression was less intense (Docket No. 14, p. 421 of 670), her auditory hallucinations had faded (Docket No. 14, p. 294 of 670), she was feeling more relaxed (Docket No. 14, p. 261 of 670), and her mood had improved and she was less nervous (Docket No. 14, p. 456 of 670).  Plaintiff seemed to regress only when she went off her medications (Docket 14, pp. 263, 289 of 670).  In May 2011, Plaintiff reported being depressed but Dr. Fajobi noted that Plaintiff had difficulty actually establishing her symptoms (Docket No. 14, p. 567 of 670).  The same was true during a May 25, 2011, appointment with Dr. Fajobi (Docket No. 14, p. 560 of 670). Additionally, while Plaintiff initially sought mental health therapy with Ms. Warner, Plaintiff's records show that she stopped this therapy in mid-2010 (Docket No. 14, p. 487 of 670).  Despite her alleged paranoia, Plaintiff's thought process was nearly always reported as being logical and organized and her thought content free from delusions (Docket No. 14, pp. 235-670 of 670).  Therefore, given the relatively static state of Plaintiff's mental impairments, this Magistrate finds that the ALJ was correct in using the residual functional capacity findings from the February 4, 2009, unfavorable decision with regard to Plaintiff's mental health impairments.

Plaintiff's physical impairments fall victim to the same fate.  Plaintiff previously received benefits for pain disorder which, based upon the previous ALJ's findings, seemed to center on Plaintiff's lower back issues (Docket No. 14, pp. 78-86 of 670).  Plaintiff now alleges that mild degenerative changes in her left hip are "new and material" changes that show a worsening of her condition warranting a new physical residual functional capacity assessment by ALJ Jarvis (Docket No. 15, p. 15 of 20).  Again, Plaintiff's argument is without merit.  As Defendant notes, both Plaintiff's back and hip complaints exceed what the medical evidence shows (Docket No. 16, p. 13 of 21).  A June 21, 2010, x-ray of Plaintiff's left hip showed only mild degenerative

24

changes without any acute bony process (Docket No. 14, p. 356 of 670).  While Plaintiff consistently had diffuse tenderness of her lumbosacral spine and paraspinous muscle areas, evaluation of all other areas, including her left hip, was normal (Docket No. 14, pp. 234-670 of 670).  Furthermore, Plaintiff stopped going to physical therapy (Docket No. 14, pp. 516, 642 of 670).  During her testimony in February 2012, Plaintiff stated that when she took her medication, her left hip pain was "not intense" and was reduced to a one or two (Docket No. 14, p. 57 of 670).  Therefore, based on the evidence, the Magistrate finds that ALJ Jarvis was correct to rely on the previous residual functional capacity assessment and recommends that the Commissioner's decision on this issue be affirmed.

## 2.    LISTING 12.04

In her second assignment of error, Plaintiff claims that ALJ Jarvis erred by not finding that Plaintiff's impairments met and/or equaled Listing 12.04 (Docket No. 15, pp. 15-17 of 20).  Defendant disagrees, arguing that the ALJ reasonably determined that Plaintiff did not satisfy the Paragraph B criteria required of Listing 12.04.  Defendant is correct.

This Court recently explained the relationship between the Listings and a claimant's impairments:

> At the third step of the sequential evaluation, the Commissioner must determine whether one, or a combination of more than one, of a claimant's severe impairments either meets or [is] equivalent in severity to one or more of the "listed" medical conditions.  These "listed" medical conditions "describes for each of the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of . . . her age, education, or work experience. 20 C.F.R. § 404.1525(a).  Within each listing, the Social Security Administration specifies the medical and other findings needed to satisfy the criteria of that particular listing. 20 C.F.R. § 404.1525(c)(3).  A claimant's impairment meets a listed impairment only when it manifests the specific findings described in the set of medical criteria for the particular listed impairment. 20 C.F.R. § 404.1525(d).  It is the claimant's burden to bring forth

25

evidence to establish that she meets or equals a listed impairment.  *See Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1981) (per curiam).

*Barnett v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 145360, *5-6 (N.D. Ohio 2013).

Under the Listings, affective disorders are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04.  The required level of severity for an affective disorder is met when the requirements of both 12.04(A) and (B) are satisfied, or when the requirements of 12.04(C) are satisfied.  These subsections read as follows:

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

    1.  Depressive syndrome characterized by at least four of the following:

        a.  Anhedonia or pervasive loss of interest in almost all activities; or

        b.  Appetite disturbance with change in weight; or

        c.  Sleep disturbance; or

        d.  Psychomotor agitation or retardation; or

        e.  Decreased energy; or

        f.  Feelings of guilt or worthlessness; or

        g.  Difficulty concentrating or thinking; or

        h.  Thoughts of suicide; or

        I.  Hallucinations, delusions, or paranoid thinking

    2.  Manic syndrome characterized by at least three of the following:

        a.  Hyperactivity; or

        b.  Pressure of speech; or

        c.  Flight of ideas; or

        d.  Inflated self-esteem; or

        e.  Decreased need for sleep; or

        f.  Easy distractibility; or

        g.  Involvement in activities that have a high probability of painful consequences which are not recognized; or

        h.  Hallucinations, delusions, or paranoid thinking

       3.      Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by both syndromes)

AND

B.      Resulting in at least two of the following:

       1.      Marked restriction of activities of daily living; or

       2.      Marked difficulties in maintaining social functioning; or

       3.      Marked difficulties in maintaining concentration, persistence, or pace; or

       4.      Repeated episodes of decompensation, each of extended duration

OR

C.      Medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

       1.      Repeated episodes of decompensation, each of extended duration; or

       2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

       3.      Current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04.

According to ALJ Jarvis, Plaintiff fails to have marked restriction in any of the Paragraph

B criteria, instead suffering from only moderate restrictions in the areas of activities of daily

living and concentration, persistence, and pace, and mild restriction with regard to social

27

functioning (Docket No. 14, p. 18 of 670).  Plaintiff alleges that the ALJ failed to consider the opinion of Dr. Fajobi, which found that Plaintiff was markedly limited in her ability to maintain attention, concentration, persistence, and pace and in her ability to accept and respond to criticism (Docket No. 15, p. 17 of 20).  Plaintiff also cites to her multiple run-ins with police and inability to care for her children as demonstrating marked limitations in social functioning (Docket No. 15, p. 17 of 20).

In his Medical Functional Capacity Assessment, Dr. Fajobi noted that Plaintiff would have marked limitations in several areas, including maintaining attention and concentration for extended periods and performing at a consistent pace without an unreasonable number and length of rest periods (Docket No. 14, p. 553 of 670).  However, these marked limitations deal only with Listing 12.04(B)(3).  In fact, Dr. Fajobi found that Plaintiff had only *moderate* limitations in nearly every area of social interaction and made no conclusion as to Plaintiff's ability to perform activities of daily living (Docket No. 14, p. 553 of 670).  Even accepting Dr. Fajobi's conclusions as absolutely true, without regard to the remainder of the evidence, Plaintiff satisfies only *one* of the Paragraph B criteria, not the required two.

As stated above, Plaintiff bears the burden of proving that her impairments meet or medically equal a listed impairment.  *Evans*, 820 F.2d at 164.  Taking into account the remainder of the evidence, it seems clear that Plaintiff does not have a marked limitation in two of the Paragraph B criteria areas.  With regard to activities of daily living, although Plaintiff claims to need reminders from her daughter to take care of personal needs and grooming (Docket No. 14, p. 199 of 670), Plaintiff reported that she could sometimes prepare her own meals and clean (Docket No. 14, pp. 199-200 of 670).  Plaintiff noted that she could drive a car, go out alone, and

28

shop (Docket No. 14, p. 200 of 670).  She also claimed to be able to watch television and handle

her own financial matters (Docket No. 14, p. 201 of 670).  With regard to social functioning,

although Plaintiff claims that she does not like to be around people (Docket No. 14, p. 201 of

670), Plaintiff's daughter noted, and Plaintiff agreed, that Plaintiff goes to church most weeks

(Docket No. 14, pp. 61, 201, 219 of 670).  Plaintiff's daughter, with whom Plaintiff spends

several hours daily (Docket No. 14, pp. 39, 48 of 670), reported that Plaintiff goes out four times

per week (Docket No. 14, p. 219 of 670).  There are no episodes of decompensation in the record

(Docket No. 14, pp. 234-670 of 670).

Given this evidence, the Magistrate finds that the Commissioner's decision to deny

benefits based on Plaintiff's failure to meet or medically equal the requirements of Listing 12.04

was based on substantial evidence and recommends that the Commissioner's decision with

regard to this issue be affirmed.

### 3.    RESIDUAL FUNCTIONAL CAPACITY

In her third assignment of error, Plaintiff argues that the ALJ erred by finding that she

could perform the requirements of light work (Docket No. 15, pp. 17-18 of 20).  Specifically,

Plaintiff argues that she had limited flexion, extension, rotation, and lateral bending, as well as

radiology evaluations showing degenerative disc and facet disease in her lower lumbar spine and

enthesopathy of the hip region (Docket No. 15, p. 17 of 20).  Defendant disagrees, arguing that

Plaintiff's complaints of lower back and hip pain went beyond what the record evidence showed

(Docket No. 16, p. 16 of 21).  Defendant is correct.

To properly determine a claimant's ability to work and the corresponding level at which

that work may be performed, the ALJ must determine the claimant's residual functional capacity.

*Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004).  According to Social Security

Regulations, residual functional capacity is designed to describe the claimant's physical and

mental work abilities.  *Id*.  Residual functional capacity is an administrative "assessment of [the

claimant's] physical and mental work abilities — what the individual can or cannot do despite his

or her limitations."  *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009)**;**

*see also* 20 C.F.R. § 404.1545(a)**.**  Residual functional capacity "is the individual's *maximum*

remaining ability to do sustained work activities in an ordinary work setting on a regular and

continuing basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or

an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (quoting *SSR* 96-

8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

     To determine a claimant's residual functional capacity, the Commissioner will make an

assessment based on all relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3).

Before making a final determination a claimant is not disabled, the Commissioner bears the

responsibility of developing the claimant's complete medical history.  20 C.F.R. §

404.1545(a)(3).  The Commissioner "will consider any statements about what [a claimant] can

still do that have been provided by medical sources, whether or not they are based on formal

medical examinations.  [The Commissioner] will also consider descriptions and observations of

[a claimant's] limitations from [his] impairment(s), including limitations that result from [his]

symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other

persons."  20 C.F.R. § 404.1545(a)(3).  Responsibility for deciding residual functional capacity

rests with the ALJ when cases are decided at an administrative hearing.  *Webb*, 368 F.3d at 633.

Here, there is no doubt that Plaintiff consistently complained of lower back and left hip pain (Docket No. 14, pp. 234-670 of 670).  Plaintiff's first medical record dealing with these issues dates back to November 29, 2008, when Plaintiff rated her pain as a nine out of ten (Docket No. 14, p. 299 of 670).  At that time, however, Plaintiff refused physical therapy and requested only Vicodin, which she claimed reduced her pain to a five or six out of ten (Docket No. 14, p. 299 of 670).  Plaintiff's next medical record dealing with her lower back and hip pain is not until nearly three years later in March 2010 when Plaintiff first saw Dr. Smith (Docket No. 14, p. 405 of 670).  An MRI showed degenerative disc and facet disease in Plaintiff's lumbar spine, but revealed no evidence of a focal protrusion or extrusion (Docket No. 14, p. 408 of 670).  While Plaintiff continuously had diffuse tenderness in her lumbosacral spine and paraspinous muscle areas with an antalgic gait (Docket No. 14, pp. 396, 402, 535 of 670), she also stopped going to her prescribed physical therapy (Docket No. 14, pp. 516, 642 of 670).  Evaluations of Plaintiff's extremities were consistently normal (Docket No. 14, pp. 234-670 of 670).  In September 2010, Dr. Smith noted that there was no disease in either of Plaintiff's hips (Docket No. 14, p. 391 of 670).  Furthermore, Plaintiff testified that she does not use an assistive device to move around (Docket No. 14, p. 42 of 670).  When asked to rate her lower back pain on a scale of one to ten, Plaintiff testified that the pain was an eight or nine without her medication, but decreased to a two or three with medication (Docket No. 14, p. 57 of 670).  Plaintiff indicated that her hip pain was less severe, usually a six or seven without medication and a one or two with medication (Docket No. 14, p. 57 of 670).  Plaintiff also testified that her hip pain was sporadic (Docket No. 14, p. 41 of 670).  Plaintiff's daughter, with whom Plaintiff spent several hours per day, reported that Plaintiff could lift fifty pounds (Docket No. 14, p. 220 of

31

670).  Furthermore, state examiner Dr. Bolz opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds and stand and/or walk for a total of six hours during an eight-hour workday (Docket No. 14, p. 382 of 670).

Therefore, although Plaintiff would have preferred the ALJ impose stricter limitations on her residual functional capacity, the Magistrate finds there to be substantial evidence to support the ALJ's current opinion.  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).  Therefore, this Magistrate finds Plaintiff's third assignment of error to be without merit and recommends that the decision of the Commissioner on this issue be affirmed.

### 4.   TREATING PHYSICIAN RULE

Finally, Plaintiff argues that the ALJ failed to properly evaluate the opinion of Plaintiff's treating psychiatrist, Dr. Fajobi, according to the treating physician rule (Docket No. 15, pp. 18-19 of 20).  Specifically, Plaintiff alleges that ALJ Jarvis erred by assigning less than controlling weight to Dr. Fajobi's opinion while simultaneously assigning great weight to the opinions of the state examiners (Docket No. 15, pp. 18-19 of 20).  The undersigned Magistrate agrees with Plaintiff..

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009)**.**  According to the Court, the treating physician rule:

requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

[T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted).

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which physicians she will consider to be "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions." *Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)).

After a thorough review of Plaintiff's record, there is no doubt that Dr. Fajobi was

Plaintiff's treating psychiatrist.  Plaintiff saw Dr. Fajobi a total of fifteen times during an

approximately three-year period, usually at regular intervals consistent with medication

management (Docket No. 14, pp. 234-670 of 670).  Dr. Fajobi provided some counseling

services, but mostly prescribed and monitored Plaintiff's medication regimen, which varied

during that time (Docket No. 14, pp. 234-670 of 670).  The Magistrate therefore finds that Dr.

Fajobi is a treating psychiatrist.

Despite this status, however, in her decision, ALJ Jarvis seemingly completely

discounted the conclusions of Dr. Fajobi, stating:

> As for the opinion of [Dr. Fajobi], I give it little weight.  In his assessment, Dr.
> Fajobi found the claimant's mental impairments would last 12 months or more.  Dr.
> Fajobi also concluded that the claimant was markedly limited in 7 mental activities,
> and moderately limited in 14 other mental activities.  However, Dr. Fajobi failed to
> provide detailed descriptions of the mental symptoms or mental status examinations
> that would support a finding of such severe limitations.  Thus, I gave Dr. Fajobi's
> opinion little weight in my analysis.

(Docket No. 14, p. 21 of 670).  As noted above, once accorded treating psychiatrist status, Dr.

Fajobi's opinion was entitled to controlling weight.  *See Blakley*, 581 F.3d at 406.  To assign

anything less required ALJ Jarvis to specifically determine and state the amount of weight given

to the opinion, based on the factors iterated in *Blakley*, originally set forth in 20 C.F.R. §

404.1527(d)(2):  (1) the length of the treatment relationship and the frequency of examination;

(2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4)

consistency of the opinion with the record as a whole; and (5) any specialization of the treating

physician.

Here, while ALJ Jarvis did indeed specify the weight assigned to Dr. Fajobi's opinion, she failed to include any of the other factors required for proper analysis (Docket No. 14, pp. 15-23 of 670).  The ALJ offered minimal explanation as to why she was discounting the opinion of Dr. Fajobi, stating only that Dr. Fajobi failed to somehow explain how he arrived at his conclusions (Docket No. 14, p. 21 of 670).  ALJ Jarvis never mentioned how *long* Plaintiff had treated with Dr. Fajobi, the frequency of her examinations with Dr. Fajobi, or the nature and extent of the treating relationship (Docket No. 14, pp. 15-23 of 670).  Additionally, the ALJ failed to discuss how or even *if* Dr. Fajobi's opinion was supported by or consistent with the balance of Plaintiff's medical record (Docket No. 14, pp. 15-23 of 670).

An ALJ must give good reasons in his notice of determination or decision for the weight she gives a claimant's treating physician.  *Blakley*, 581 F.3d at 407; *see also* 20 C.F.R. § 404.1527(c)(2).  These good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 407 (*quoting SSR* 96-2p, 1996 SSR LEXIS 9 at *12) (internal quotations omitted)).  ALJ Jarvis failed to provide these "good reasons" in her written opinion.

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations.  *Wilson*, 378 F.3d at 545.  "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process."  *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)).  Courts have

35

remanded the decision of the Commissioner when it has failed to articulate "good reasons" for not crediting the opinion of a claimant's treating physician.  *Wilson*, 378 F.3d at 545.

Therefore, based on the ALJ's failure to abide by the requirements of the treating physician rule, the Magistrate recommends that the Court reverse and remand, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision to assess the weight given to the treating physician consistent with its own rules.

### VIII. CONCLUSION

For the foregoing reasons, this Magistrate recommends that the Court affirm the Commissioner's decision as to Plaintiff's first, second and third assignments of error and remand the case to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), to properly consider the opinion of Plaintiff's treating psychiatrist, Dr. Fajobi and its affect on whether Plaintiff is disabled.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:  March 14, 2014

36

## IX.  NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

37